# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1734V

| | |
|---|---|
| CAROLE THERO, as Personal Representative of the ESTATE OF LAURIE RYAN, | Chief Special Master Corcoran |
| Petitioner, | Filed: October 20, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*John Robert Howie, Howie Law, PC, Dallas, TX, for Petitioner.*

*Mark Kim Hellie, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On November 23, 2022, Laurie Ryan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). On February 25, 2025, following Ms. Ryan's death (reportedly from natural causes unrelated to her vaccine injury), Carole Thero was substituted as representative of Ms. Ryan's estate. Petitioner alleges that Ms. Ryan suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine Ms. Ryan

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

received on November 2, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

The parties have now fully briefed entitlement and damages (ECF Nos. 26, 28, 29). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $40,000.00.

**I.    Factual Evidence**

    **A. Medical Records**

Ms. Ryan received the vaccine alleged as causal in her left deltoid on November 2, 2020. Ex. 2 at 4-5. Three weeks later (November 23, 2020), she saw nurse practitioner Kimberly Stein, her primary care provider ("PCP"), for an annual examination and evaluation of arm pain. Ex. 3 at 24. Ms. Ryan explained that her left upper arm hurt, with pain radiating to the forearm and clavicle. *Id*. The record of the visit states "[c]ontext: post flu vaccine," adding that Ms. Ryan "reports pain started post flu injection and progressed to symptoms listed above." *Id*. The pain was aggravated by movement, and she reported decreased mobility, difficulty falling asleep, pain at night, spasms, and weakness. *Id*. She was given oral steroids, and an ultrasound was ordered to rule out SIRVA, bursitis, and labral tear due to pain and limited range of motion ("ROM") after vaccination. *Id*. at 25. An examination noted that Ms. Ryan exhibited severe pain with motion. *Id*. at 27.

The following month (December 15, 2020), Ms. Ryan underwent a left shoulder ultrasound. Although the ultrasound report states the study was "[u]nremarkable," (Ex. 3 at 41), when Ms. Ryan saw physician assistant ("PA") Christopher Daugherty virtually on December 30, 2020, he noted that the ultrasound "was not completed, as the Radiologist reportedly was requesting an MRI for more information." Ex. 4 at 32.

At the December 30th consultation with PA Daugherty, Ms. Ryan reported that her pain had started two months prior and was constant. *Id*. The pain impaired her ability to perform her job functions as a home health certified nursing assistant ("CNA"). *Id*. Her ROM had improved mildly. *Id*. PA Daugherty assessed Ms. Ryan with "[p]ossible SIRVA as pt ties the onset of persistent, significant shoulder pain to influenza vaccine from 11/2/2020." *Id*. PA Daugherty ordered an MRI.

On February 8, 2021, Ms. Ryan underwent a left shoulder MRI. Ex. 3 at 42. The MRI showed a partial thickness tear of the supraspinatus tendon, suspected tendinosis of the infraspinatus tendon with possible tearing/fraying, tendinosis of the subscapularis tendon, a biceps tendon tear, subacromial/subdeltoid bursitis, and full-thickness chondral fissuring of the anterior glenoid. *Id*. at 42-43. On March 23, 2021, Ms. Ryan's PCP referred her to an orthopedist. Ex. 4 at 77-78. The reason for the referral was "[l]eft shoulder pain."

*Id*. However, Ms. Ryan did not see an orthopedist, or seek further care for her shoulder pain, for several months.

On August 16, 2021, now nine and a half months after vaccination and six months after her MRI, Ms. Ryan saw orthopedist Dr. Ross Schumer for left shoulder pain. Ex. 4 at 74. She reported that she received a flu vaccine on November 2nd the prior year, and had "acute pain at the time of the injection which persisted." *Id*. She described "fairly significant pain for several weeks," which was now improving. *Id*. She rated her pain four out of ten. *Id*. at 77. She had achiness and stiffness in the morning, which improved with movement. *Id*. at 74. On examination, Ms. Ryan exhibited "full symmetric range of motion with 160 degrees of forward flexion and abduction." *Id*. at 76. She had a painful arc from 80 to 160 degrees, and positive Speed's testing. *Id*. Dr. Schumer reviewed the MRI and noted that it showed "[s]ignificant subacromial/subdeltoid bursitis" as well as a partial-thickness tear and tendinosis. *Id*. Ms. Ryan declined a steroid injection, and was advised to follow up as needed. *Id*. Petitioner has not filed records of additional treatment for Ms. Ryan's shoulder.

### B. Testimonial Evidence

Ms. Ryan filed two sworn statements in support of the claim, dated November 21, 2022 and June 12, 2024. Exs. 1, 5. She stated that she could tell immediately that the November 2, 2020 flu vaccination "was different from any other flu shot I had ever received" in that it was administered higher and deeper than usual. Ex. 1 at ¶ 4. Later that day, she began to experience pain in her left upper arm and shoulder. *Id*. By the next morning, her pain had worsened. *Id*. Initially, she thought this was normal post-vaccination pain (albeit worse than usual), and would resolve on its own with time. *Id*. However, as the days passed, the pain was "persistent and unrelenting." *Id*. After several weeks, she decided to seek medical attention. *Id*.

When Ms. Ryan saw her PCP, she described her pain as aching, burning, dull, and sharp, and noted that it radiated toward her forearm and clavicle. Ex. 1 at ¶ 5. She was given steroids and an ultrasound was ordered. *Id*. Once her insurance approved the ultrasound, she had it done. *Id*. at ¶ 6. She then returned to her PCP's office, where she was referred for an MRI. *Id*. at ¶ 7.

In April 2021 – two months after the MRI was performed – Ms. Ryan moved to Denver, Colorado, two hours away from her prior residence in the Colorado Springs area, to be closer to her aging parents. Ex. 1 at ¶ 9. She did not have health insurance, but due to her low-income status had medical coverage through a community health program. *Id*.; Ex. 5 at ¶ 6. However, that program's clinics were primarily in the Colorado Springs area, and specialty services such as orthopedic care were not available in other cities. *Id*. Ms. Ryan did not have sufficient income to seek treatment without health insurance and thus was unable to seek further care until she returned to Colorado Springs in August 2021, at which time she saw an orthopedist. Ex. 1 at ¶ 10. At the time of her first sworn statement

in November 2022, Ms. Ryan continued to experience issues with her left arm and shoulder that interfered with her use of her arm in her work as a CNA. *Id.* at ¶ 11.

Ms. Ryan explained that she held a state certification in strengthening and conditioning and is a licensed personal trainer. Ex. 5 at ¶ 3. After her vaccine injury, she "engaged in a self-directed stretching and strengthening program" that focused on improving her shoulder ROM, pain, and strength. *Id.* at ¶ 4. She did not think formal physical therapy would provide any additional benefit, due to her education, training, and experience. *Id.*

At the time of her injury, Ms. Ryan was working as a CNA performing hospice and home care for elderly and debilitated individuals, with appointments in the morning, afternoon, and evening. Ex. 5 at ¶ 5. Because there was a shortage of nurses and nurse's aides available to provide patient care due to the COVID-19 Pandemic, Ms. Ryan was working "significantly more hours" than usual, severely limiting her time available for medical appointments. *Id.*

Ms. Ryan stated that her injury had a significant impact on her daily life. Ex. 5 at ¶ 7. The pain interfered with her sleep, resulting in her being exhausted throughout the day. *Id.* She also struggled to manage her emotions while caring for patients who required significant compassion due to their hospice status or aged and debilitated conditions. *Id.* Each day felt like a battle she was losing. *Id.*

Ms. Ryan's injury also interfered with activities such as bathing, dressing, and washing, drying, and styling her hair. Ex. 5 at ¶ 8. Her shoulder ROM was impaired, making it difficult to raise her arm above shoulder height. *Id.* She had to endure pain to accommodate basic needs. *Id.* She had to drive to visit clients in their homes, and was unable to use her left arm to open or close the door, or to steer the car. *Id.* at ¶ 9.

Ms. Ryan's work as a CNA included many responsibilities that required her to use both arms, such as transporting, bathing, dressing, lifting, turning, and transferring clients, as well as changing bed linens and cleaning and organizing personal items for clients. Ex. 5 at ¶ 10. These responsibilities caused "a significant amount of pain on a regular and frequent basis," and she often had to request assistance due to her shoulder injury. *Id.*

In early 2021, Ms. Ryan decided to move to Denver to be near her aging parents. Ex. 5 at ¶ 11. Her parents still lived at home without assistance, and with the COVID-19 crisis beginning to wane as vaccines were administered, she wanted to care for them rather than arrange for another home health worker to do so. *Id.* She moved in April 2021, and once she was settled, she looked into seeing an orthopedist as a "self-pay" patient. *Id.* However, she realized she could not afford it and would have to return to a provider in the community health program in Colorado Springs. *Id.*

## II.  Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that the vaccinee suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that the vaccinee "suffered the residual effects or complications of such illness, disability,

---

[3] In summary, a petitioner must establish that the vaccinee received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

5

injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

6

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Entitlement

#### 1. Onset

Respondent argues that Petitioner has not established that Ms. Ryan's shoulder pain began within 48 hours of vaccination because she did not seek care until three weeks post-vaccination. Respondent's Response, filed Aug. 14, 2024, at *5-7 (ECF No. 28) ("Resp."). Although at Ms. Ryan's first treatment appointment she did in fact relate her pain to vaccination, Respondent asserts that the records of this appointment "do not specifically discuss onset, except that it was 'post flu vaccine.'" *Id.*

Petitioner emphasizes that Ms. Ryan sought treatment less than one month after vaccination, and in doing so related the beginning of her pain to that vaccination. Petitioner's Motion for Ruling on the Record, filed June 13, 2024, at *2-7 ("Mot."). And Ms. Ryan provided supporting testimonial evidence. *Id.* Petitioner argues that Respondent's arguments concerning onset are "essentially identical to those already considered" and rejected in *Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5051154 (Fed. Cl. Spec. Mstr. July 27, 2020).

Petitioner argues that a 21-day delay in seeking treatment is "truly not that long,"

7

particularly for someone who is a licensed medical professional. Petitioner's Reply, filed Aug. 28, 2024, at *3 (ECF No. 29) ("Reply"). And Respondent has not identified any intervening medical visits that are silent on shoulder pain. *Id.* at *4.

### 2. Whether Pain was Limited to Ms. Ryan's Shoulder

Respondent also asserts that Ms. Ryan's pain was not limited to the shoulder where she received the vaccine. Resp. at *6-7. Respondent relies on the record of Ms. Ryan's November 23, 2020 appointment, where she reported that her shoulder pain radiated into her forearm and clavicle. *Id.*

Petitioner argues that this is the only statement in the medical records suggesting symptoms beyond her left shoulder. Mot. at *8. And at that appointment, Ms. Ryan was assessed with left upper arm pain, with a differential diagnosis including SIRVA, bursitis, labral tear. *Id.* The billing record for Ms. Ryan's ultrasound includes a diagnosis of left upper arm pain, and the clinical indication for the study was listed as left shoulder pain status post injection. *Id.* And the ultrasound and MRI examined Ms. Ryan's left shoulder, and no other part of her body. *Id.* at *8-9.

### 3. Severity

Respondent argues that Ms. Ryan has not established that she suffered residual effects of her injury for more than six months, and thus the claim should be dismissed. Resp. at *7. Although Ms. Ryan saw an orthopedist about nine and a half months after vaccination, this followed a six-month gap in treatment. *Id.* Additionally, Ms. Ryan's orthopedist "did not specifically attribute [Ms. Ryan's] left shoulder pain to her vaccination." *Id.*

Petitioner asserts that the mere existence of a gap in treatment does not, by itself, mean that a claimant cannot meet the severity requirement. Mot. at *11-13. Petitioner explains that six weeks after the MRI, Ms. Ryan contacted her PCP to report that she continued to experience left shoulder pain, and was referred to an orthopedist. *Id.* at *11. However, Ms. Ryan was in the process of moving to another city to care for her aging parents and thus was unable to pursue the referral immediately. *Id.* Several months later, Ms. Ryan returned to her prior residence and saw an orthopedist. *Id.*

### C. Factual Findings on Onset

I find that the record supports a finding that the onset of Ms. Ryan's left shoulder pain likely occurred within 48 hours of vaccination. There are multiple records supporting onset within 48 hours, while none suggest a later onset. And Ms. Ryan's testimonial statements support this finding.

Ms. Ryan sought care just 21 days after vaccination, complaining of shoulder pain that she related to vaccination. This timing does not, without more, suggest that Ms. Ryan's shoulder pain began more than 48 hours after vaccination. It is common for people

8

alleging a SIRVA to delay seeking care for this length of time – or *much longer* – because they expect the pain to go away on its own. *See Shiver v. Sec'y of Health & Human Servs.*, No. 21-1961V, 2024 WL 4544185, at *11 (Fed. Cl. Spec. Mstr. Sept. 16, 2024) (finding evidence preponderantly established that onset of shoulder pain occurred within 48 hours of vaccination where the petitioner first sought care just two weeks after vaccination); *Amor v. Sec'y of Health & Human Servs.*, No. 20-0978V, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024) (noting that it is "common for petitioners in SIRVA cases to delay seeking care for weeks, or even months, in hopes that the pain will resolve without treatment" and finding onset was within 48 hours when Petitioner first sought care 23 days after vaccination); *Diaz v. Sec'y of Health & Human Servs.*, No. 20-1003V, 2023 WL 8440873, at *8 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset occurred on day of vaccination even though the petitioner did not seek treatment until over three months later).

"There is no requirement that a medical record state that a petitioner's pain began specifically within 48 hours in order for a claimant to succeed on a SIRVA Table claim." *Kelly v. Sec'y of Health & Human Servs.*, No. 21-2202, 2025 WL 1276206 (Fed. Cl. Spec. Mstr. Mar. 18, 2024). Rather, a petitioner must demonstrate by a preponderance of the evidence that the vaccinee's pain began within 48 hours. *Roberson v. Sec'y of Health & Human Servs.*, No. 21-2309V, 2025 WL 605724 (Fed. Cl. Spec. Mstr. Jan. 24, 2025) (the "absence of a specific date" of onset in medical records is not "compelling or particularly meaningful" where the petitioner sought care 23 days after vaccination and reported pain for two to three weeks at the time of vaccination).

### D. Factual Findings on Whether Pain was Limited to Ms. Ryan's Shoulder

The record preponderantly reflects Ms. Ryan's pain was limited primarily to her left shoulder, satisfying the third QAI. Although she reported that her shoulder pain radiated to her forearm and clavicle at her first appointment, this record locates the *origin* of her pain as her vaccinated shoulder. *See Valdez v. Sec'y of Health & Human Servs.*, No. 21-0394V, 2024 WL 1526536, at *6-7 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (finding third QAI satisfied despite pain radiating to upper arm and forearm because the petitioner *primarily* experienced a shoulder injury consistent with SIRVA); *Cross v. Sec'y of Health & Human Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) ("claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there") (emphasis in original). And no other records indicate that Ms. Ryan's pain was not limited to her vaccinated shoulder. However, pain or treatment associated with Ms. Ryan's forearm and clavicle symptoms cannot be factored into the damages award.

9

### E. Factual Findings on Severity Requirement

The evidence supports a finding that Ms. Ryan likely suffered the residual effects of her injury for more than six months. Ms. Ryan sought treatment for her shoulder injury promptly, and continued treatment until three months after vaccination. A month and a half after her MRI, she requested an orthopedic referral. However, soon thereafter she moved two hours away, to a new location where she could not receive orthopedic care without paying out of pocket. For financial reasons, she was not able to see an orthopedist until she returned to Colorado Springs several months later.

A treatment gap can call into question whether a vaccinee's injury persisted, or whether some intervening event or factor better explains what transpired thereafter. *Ramirez v. Sec'y of Health & Human Servs.*, No. 21-0344V, 2024 WL 4297848 (Fed. Cl. Spec. Mstr. Aug. 16, 2024) (dismissing claim where petitioner sought care for injury four and a half months, then did not seek care for shoulder for eight months despite attending numerous medical visits for other concerns). However, the fact that a vaccinee ceases medical care for an interval – or even stops seeking treatment altogether - does not necessarily establish that the injury had resolved at that time. *Rodionov v. Sec'y of Health & Human Servs.*, No. 20-0842V, 2023 WL 8112948 (Fed. Cl. Spec. Mstr. Oct. 18, 2023) (finding severity requirement met despite seven-month gap where petitioner reported condition continued during gap, but he lost health insurance and thus was unable to receive medical care).

In this case, the evidence shows that Ms. Ryan was referred to an orthopedist for further care after the February 2021 MRI. However, she has reasonably explained that she was delayed in following up on that referral due to her move and lack of covered providers in her new city. And when she saw an orthopedist nine and a half months after vaccination, her pain was improving but remained four out of ten. The record supports a finding that, more likely than not, Ms. Ryan's injury persisted throughout the gap between her orthopedist referral and orthopedist appointment.

### F. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Ms. Ryan had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 3 at 8-23. She exhibited reduced ROM. Ex. 3 at 25. She received a covered vaccine in the United States. Ex. 2 at 4-5. And Ms. Ryan testified that she never received compensation in the form of an award or settlement for her vaccine-related injury, nor had she filed a civil action prior to this case. Ex. 1 at ¶ 13.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $40,000.00. Mot. at *16. She relies on decisions in *Mejias*, *Merson*, *Ramos*, and *McGraw*, involving pain and suffering awards of $45,000.00, $45,000.00, $40,000.00, and $37,500.00, respectively.[5] *Id.* at 18-28.

Petitioner asserts that this case is nearly identical to *Mejias,* except that the *Mejias* petitioner sought care sooner than Ms. Ryan did (just two days after vaccination). Mot. at *18. In recognition of this difference, Petitioner proposes a slightly lower award. Both Ms. Ryan and the *Mejias* petitioner treated with orthopedic consults and prescription medications, and both declined steroid injections and physical therapy. *Id.* at *18-20. And

---

[4] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] *Mejias v. Sec'y of Health & Human Servs.*, No. 19-1944V, 2021 WL 5805662 (Fed. Cl. Spec. Mstr. Sept. 10, 2021); *Merson v. Sec'y of Health & Human Servs.*, No. 18-0589V, 2022 WL 4855661 (Fed. Cl. Spec. Mstr. Aug. 16, 2022); *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021); and *McGraw v. Sec'y of Health & Human Servs.*, No. 21-0072V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024).

11

Ms. Ryan sought care much sooner than the *Merson* petitioner, who did not seek care for nearly five months, with both also declining steroid injections and physical therapy. *Id.* at *21-23.

Petitioner acknowledges that the *Ramos* petitioner attended 11 occupational therapy sessions, while Ms. Ryan did not engage in any of that kind of treatment. Mot. at *23-25. However, Ms. Ryan sought care only 21 days after vaccination, compared to four months for the *Ramos* petitioner. *Id.* And although the *McGraw* petitioner attended acupuncture sessions and Ms. Ryan did not, the *McGraw* petitioner also delayed seeking treatment for 58 days and her treatment was mostly complete by five months after vaccination, sooner than for Ms. Ryan. *Id.* at *26-28.

Respondent argues that Ms. Ryan's overall injury was "very mild," and proposes aw award consistent with similar cases, although he does not propose a specific amount. Resp. at *8. Respondent emphasizes that Ms. Ryan's treatment course was "very limited," comprised of three medical appointments, an ultrasound, and an MRI over nine and a half months – including a six-month treatment gap. *Id.* at *11.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Ms. Ryan was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Ms. Ryan's injury.

Ms. Ryan suffered a relatively mild injury that persisted for about nine and a half months. Her injury was sufficiently painful and limiting that she sought treatment just three weeks after vaccination. She then pursued diagnosis and treatment for two and a half months. At that point, she did not seek care again for another six months. Ms. Ryan has credibly explained that the treatment gap was not due to her pain resolving. Rather, during this time she moved two hours away, and her community health program did not include specialists in her new area.

Of the cases cited, I agree with Petitioner that *Mejias* is the best comparison. Both the *Mejias* petitioner and Ms. Ryan suffered relatively mild injuries, which were treated conservatively. Neither attended physical therapy or underwent surgery or cortisone injections. They had similar injury durations, and both had lengthy gaps in treatment. However, the *Mejias* petitioner appears to have had a more severe condition, exemplified by his receiving care just two days after vaccination. As such, I agree with Petitioner that a slightly lower award is appropriate.

In light of the record evidence, I find that an award of **$40,000.00** for pain and suffering is appropriate.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Ms. Ryan suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $40,000.00 represents a fair and appropriate amount of compensation for Ms. Ryan's actual pain and suffering**.[6]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $40,000.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.